Johnson, J.
The complainant is the widow of Col. Aromanus Lyles, and the defendants, the Lyles’, and Mrs. Moody, are his children, by a former marriage. Col. Lyles intermarried with the complainant in February, 1817, and died in the month of September in the same year, leaving no child or children by that marriage. He was possessed at -the time of his death of some real, and considerable personal estate, consisting principally of negroes, and administration thereof was granted to the complainant and the defendant, Ephraim Lyles, jointly; but Ephraim Lyles took upon himself, almost exclusively, the management of the estate ; and the object of this bill was to obtain an account of the estate, *and for partition amongst the parties, according to the act of distributions. One of the grounds on which the defendant resisted complainant’s right to distribution was, that she was not the lawful wife of Col. Lyles, but of Philip James, to whom it was conceded she had been before married, and who, the defendants charged, was living at the time of her intermarriage with Col. Lyles, and an issue was sent down to the Court of Law, to try the truth of that allegation.
On the trial of the issue, a verdict was found for the complainant, establishing the fact of Philip James’s death, and a motion was made before the Chancellor on the Circuit, for a new trial, on the grounds: *58 first, that the presiding Judge at law, had excluded important and competent evidence; secondly, that the verdict was against the evidence ; thirdly, because the presiding Judge expressed in his charge to the jury a decided opinion, that there was not evidence enough to show that Philip James was alive, at the time of the complainant’s intermarriage with Col. Lyles. .The Chancellor overruled the motion, and decreed for the complainant on that question, and directed an account of the personal estate ; and the same grounds have been taken here, on a motion to reverse the Chancellor’s decree, and for a new trial.
1. The first ground arises out of the following state of facts. Henry Davis,- a witness on the part of the defendants, testified that he had seen Philip James in 1817, near Leaf River, Mississippi, and that he was then alive and well. Lucy Farr, a witness examined by the defendants, stated, that she had been present when one Elizabeth Brown had enquired of the witness, Henry Davis, if he had recently seen Philip James : at first, “he did not appear to say he had,” but after a private interview between them, Davis said he had seen him in going to, or returning from Pearl River. Elizabeth Brown told the witness, Mrs. Farr, that she was to be well paid by the defendant, Ephraim Lyles, if she could find a person that would swear that Philip James was alive, and that Davis would be well paid if he had seen, or would swear that he had seen him within a certain length of time. This witness *did not believe that Davis had ever seen Philip James, but that he was prevailed on by Elizabeth Brown to swear that he had. The defendants then offered Nathan -Vincent, to prove that he had heard the witness Davis say, in the latter part of the year 1817, after his return from the Mississippi, that he had seen Philip James. (The Chancellor, it is conceded, was mistaken in supposing that it was the affidavit of James which was offered.) The presiding Judge rejected the evidence thus offered, and the question is, whether it was, or was not admissible.
It does not seem to admit of any question, that the credit of a witness may be impeached, by proof that he has made declarations inconsistent with the facts to which he has sworn ; and on that principle, a letter written by a witness was admitted by Lord Kenyon, in De Sailley v. Morgan, 2 Esp. Rep. 691, to contradict what he had sworn to on the trial: and C. B. Gilbert is of opinion that in reply .to such evidence, proof of the declarations of the witness, on other occasions, consistent with what he had testified, is admissible to show he is consistent with himself. (See Gilbert’s Ev. 135.) Judge Buller is clearly of opinion that it is not admissible, on the examination in chief, to support an unim-peached witness, and doubts whether it is admissible in reply. Buller N. P. 294; and this opinion is mentioned by Mr. Starkie, in his treatise on Evidence, (Vol. 1, part 2, page 148-9.)
My own mind inclines very much to the opinion expressed by the Chief Baron. The only reason urged against it is, that proof of inconsistent declarations made by a witness does not add any .thing to his credit, and only tends to lessen the confidence in his credit or memory, and what he has asserted is not entitled to more credit, than what he has sworn. But it does not follow necessarily, that the witness-who has testified to the inconsistent declarations, has told the truth, or that he may not be mistaken. For example — suppose that the inconsistent declarations are *59 proved by one witness only, and that twenty others testify, that in the same day, and at other 'times and places, and under every variety of circumstances, they had heard him make declarations consistent with what he had sworn — would not that raise a well founded doubt, whether* the witness who proved the inconsistent declarations had sworn the truth or was mistaken ? These circumstances would certainly change the character of the issue, by involving the credibility of the last, as well as the first witness, and for that reason I incline to think the evidence ought to have been admitted.
2. Philip James married the complainant about the year 1185, and in a few years after, abandoned her and went away. Some time after, it was reported and universally credited, that he was dead, and about 1800 or 1801 the complainant was married to Joseph Kennerly, a worthy and very respectable man. He died about 1808; and shortly after, she was again married to Cullen Fennel, who died about two years after; and last of all she intermarried with Col. Lyles in 1811; and during all this time, amongst their acquaintances here, no one doubted the rumor of Philip James’s death was true. His mother, Elizabeth James, who was examined on the part of the complainants, states, that after he abandoned the complainant, and before 1190, he had married another wife ; and she saw him for the 'last time about that period. In 1812 she (the witness) received a letter from his last wife, in which she stated that he died in Tennessee two or three years before, and the truth of it was believed by all his friends. The only doubt as to the death of Philip James, arises out of the evidence of two witnesses examined for the defendants. Henry Davis, the witness before spoken of, who states that he had seen him alive and well near Leaf River, in Mississippi, in 1811 ; and James Yessels, who testified that he had seen him on the Tombigby, in 1818, and that he saw his son in 1811 or ’18, who told him that he was still alive.
A great number of witnesses (say fifty or more) have been examined on both sides, as to the credit of these two witnesses, who are now both aged men. Those who speak of Henry Davis, generally agree, that the most implicit confidence ought not to be placed in what he would say in ordinary conversation — to use the language of the witnesses, “he is now as he always has been, given to romancing.” As many as fourteen, perhaps more, think he is not entitled to credit on his oath; and on the other hand, perhaps as many think him *worthy of belief. Taken then the most favorable view, the credit of this witness is extremely equivocal. He is precisely that sort of witness that one would be disposed to credit or not, as his evidence might be favored by other circumstances of the case; and when opposed by the presumption arising from the evidence of Elizabeth James, and the facts stated by Lucy Farr, whose credit is unimpeached, it is utterly unworthy of credit.
The credit of James Yessels is still more exceptionable. The late Mr. Solicitor Starke testified, that he knew him a soldier in the revolutionary war when he was too young to have acquired a character, but that immediately after he became notorious for the want of truth. In 1188 he was committed for horse-stealing, at Ninety-six, and pardoned, and on his cross-examination on this trial denied the fact. He resided at the time o,f his examination in Georgia, and several persons who then (in 1826) resided in his neighborhood, testified that his character was infamous; and *60 on the other hand there were found amongst his general acquaintances who had formerly known him, very respectable men, who testified their belief that he was worthy of credit.
It would be uncharitable to conclude that every one who is suspected, is unworthy of credit; but I have always remarked, that there was very great difficulty in procuring evidence to assail the character of a witness, and unusually rare that a whole community should concur in denouncing him. The more indulgent feelings of some, the partialities of others, and the great disinclination of all, to place a fellow-creature under the ban of public opinion, unless he is utterly lost to all sense of truth and honesty, operate powerfully in his favor. It is not often that we find such a weight of evidence against the credibility of witnesses, as exists here. The Jury were, therefore, well warranted in discrediting them altogether.
3. 3STo instance has ever occurred in this Court, in which a new trial has been granted on the naked ground, that the presiding Judge had expressed to the jury, his own opinion as to the truth of the facts. On the contrary, it has been said again and again, that it is his duty to aid the Jury with his learning and experience in arriving at a. correct conclusion. There is, I believe, scarcely a considerate member of the profession, who does not concede that public justice is promoted by it. Every one of any experience must have remarked with what difficulty an inexperienced jury arrive at conclusions, in cases depending on contradictory and complicated evidence; and how uncertain the result, unless the Court in a greater or less degree, share the responsibility and assist them in their conclusions; and notwithstanding the improper exercise of this practice might innovate on the trial by the jury, my own experience satisfies me, that the occasional omission on the part of the Judge to discharge this duty, is even more productive of a much greater evil. There is then nothing in this ground.
Having thus disposed of the grounds of the motion for a new trial on the issue at law, it remains to determine what order the Court will make upon it. The rule at law very clearly is that a new trial ought to be granted, when the Court has rejected competent evidence; and from the view which I have taken of the matter, it must be conceded that the evidence of Nathan Yincent, tendered to prove declarations of Henry Davis, consistent with what he had sworn, ought to have been admitted. But this was an issue directed by the Court of Chancery. The object of it, was to satisfy the Chancellor as to the truth of the fact whether Philip James was or was not alive at the time of the complainant’s intermarriage with Col. Lyles. The verdict of the jury is the result of their' opinion upon that question. The opinion of the Law Judge is of great consideration to the Chancellor. In this case he has not, as is usual, formally reported it to the Chancery, but one of the complaints made by the appellant, is, that he expressed his opinion too decidedly, and we are in no doubt as to the opinion of both judge and jury. I think, too, upon a dispassionate review of the facts as they are presented to us here, we should, without hesitation, arrive at the same conclusion. The question then is whether the Court will order a new trial, on the ground of the rejection of the evidence of Nathan Yincent.
*61 As before remarked, the object of directing an issue at *law, is to inform the conscience of the Chancellor; and the authorities generally agree that he may, in his discretion, grant or refuse a new trial, on account of the rejection or admission of proper or improper evidence on the trial at law. In Pemberton v. Pemberton, 11 Ves. 52, the Ld Chancellor Eldon says, he may look not only at the report of the trial at law, but at the record of the suit in equity, and may collect what may satisfy his conscience; and if upon the whole, he is satisfied that justice has been done, though he may think some evidence was improperly rejected at law, he is at liberty to refuse a new trial. In the case of The Warden and minor Cannons of St. Paul’s, London v. Morris, 9 Ves. 169, the same learned Chancellor asks the question — “ Is the Court necessarily to grant a new trial, if material evidence was rejected ? Or is it not at liberty, supposing it material, to consider in what degree it is so ; and whether its materiality is such that because it was rejected, a new trial must be granted, even if the conscience of the Court is satisfied that the conclusion is right ?” And he answers, “ In all times, this Court in'such a case as this has exercised its discretion upon the whole case.” He then enters into a consideration of the question, whether the excluded evidence would or would not have produced a different result, and a new trial was refused, on account of the difficulties with which the case was surrounded in making the necessary proofs. In Hampson v. Hampson, 3 Ves. & Beame, 44, the case is put directly upon the question whether the excluded evidence would have produced a different result, and the Chancellor being of opinion that it ought not, refused a new trial.
The infamy of the character of James Yessels, is such as to justify the Court in putting his evidence entirely out of view, and I confess that in my estimation, Henry Davis is not entitled to much more consideration. His character at best is equivocal, and when we take into consideration the circumstances stated by Lucy Farr, tending very strongly to show, and from which she herself had drawn the conclusion, that he had been suborned by Elizabeth Brown, I am constrained to say, that in .my judgment, his evidence would *have been but little strengthened by the questionable support it would have derived from the evidence of Hathan Yineent. Philip James had not been heard of in this country for near forty years before the intermarriage of the complainant with Col. Lyles — the defendants allege that he was then living, and it was incumbent on them to prove it. The only evidence they offer of it, is of two witnesses, whose general character and credibility is at best doubtful, and that is opposed by the evidence of Philip James’s mother; and it is very extraordinary if Philip James was still alive in 1817 or ’18, that some one witness of unimpeachable veracity could not in the course of ten years’ litigation, have been procured to prove it. The verdict of the jury was founded on a belief of whatthese witnesses testified. The Judge who presided at the trial of the issue at law, took the lead in it, and the Chancellor has acquiesced. I do not think therefore, that the evidence of Nathan Yineent, which we must assume was improperly excluded, can vary the conclusion at which this Court would have arrived. The motion for new trial must therefore be refused.
On the part of the complainant, eleven different grounds have been taken to reverse the decree of the Chancellor in relation to the matters of *62 account between the parties; but before I enter upon the consideration of these, it will be necessary to take a general view of the transactions connected with the estate. The complainant was, herself, possesséd of a considerable estate, and shortly before her marriage with Col. Lyles, she settled it on her daughter and only child, as stated in the answer of Ephraim Lyles, with the knowledge and consent of Col. Lyles, and upon an understanding that the children of each were to have their respective estates, no children of that marriage being anticipated, being both old. Before or about the time of their marriage, Col. Lyles executed a writing in the form of a deed, purporting to be a marriage contract, in which he disclaims and renounces all interest in her property or estate, and reserves the whole of his own for his children by a former maz'riage. It was signed, however, only by Col. Lyles, nor was there any trustee to take, or other third person named in it; and by a decree of the Court of Appeals in December Term, 1824, it was held that this deed was void. (Harper’s Eq. Rep. *295.) TJpon administration being granted, Ephraim Lyles possessed himself of the principal part of the ¡oersonal estate, and took upon himself to determine that this paper was valid as a marriage contract, and excluded the complainant from any participation in the estate; and he therefore made distribution of it between himself and the other defendants, the children of Col. Lyles. Long before the intermarriage of Col. Lyles with the complainant, he had made a parol partition of all his real estate, amongst his three sons, James, Aromanus, and Thomas. He put James and Aromanus into the immediate possession of the portions allotted to them reserving to himself a life estate in that allotted to Thomas, consisting about 320 acres, on which he continued to reside up to the time of his death. The complainant claimed partition of the whole, but in the judgment before referred to, it was determined that James and Aromanus were entitled to hold under their possession, and that Thomas was not, on account of the absence of a corresponding possession. Ephraim Lyles says in his answer, that on the complainant’s going on a visit to Lexington, he placed a tenant in the house, for the purpose of keeping possession of it, but he does not believe that any violence was offered to the complainant by the tenant. This is an answer to an allegation in the complainant’s bill, that the defendants turned her out by violence. The Commissioner reports, that there were about 150 acres of the land cleared and inclosed, and it is inferable from the circumstances, that the other defendants acquiesced in the claim of Thomas Lyles, and he took possession of it,' and cultivated small portions of it from year to year. It does not appear from any thing before the Court, under what circumstances Thomas Lyles entered, or whether he had any agency in putting in the tenant, or in any instance denied the complainant’s right, or obstructed her entry.
In this report, the Commissioner has fixed the annual rent of the better quality of land, what he calls cotton land, at two dollars per acre, and the inferior quality at one dollar per acre; and .establishing ten per cent, per annum, as the scale of the deterioration of the land, he deducts that amount annually, so that no l'enfc is charged after the expiration of ten years. The Chancellor has so far corrected the report, as to ^direct that something shall be allowed, even after the expiration of that period.
*63 The first ground of the complainant’s appeal, complains that this is error, and insists that the complainant is entitled to full rent for the whole period
The rule adopted by the Commissioner and considered as merely arbitrary, is certainly not sustained by any principle. The soil of this country varies from the extremes of fertility, to the most indomitable sterility, so that the rule in one case is wholly inapplicable to another, unless the quantity of the land, the mode of culture, and the crops raised, correspond in every particular — in.every case, therefore, the value of rent can only be ascertained by the opinion of witnesses competent to judge, and acquainted with the land. In this country inferior land depreciates rapidly, under the ordinary, indeed the almost universal, mode of culture —even the provident planter does not so husband his land as to prevent deterioration, and a reasonable abatement ought to be made on that account, but no general rule can meet the case, and the decreased value must be ascertained in the manner mentioned. Land rent must be worth something, as long as it is fit for cultivation. This matter must therefore be referred back to the Commissioner.
In connection with this subject, the questions are raised, who is liable for rent ? And to what extent is it due ?
Independently of the concession made in the answer of Ephraim Lyles, that in the absence of the complainant he had put a tenant into the house to keep possession of it, there is nothing to show the fact, that the complainant was -ousted of the possession. Houston G-oree, the only witness who speaks on this subject, says that he .saw one David Dunkin living in the house, shortly after the death of Col. Lyles, who appeared to be the proprietor of it for the time, and thinks he heard him say, that he was put there to keep the complainant out. But it does not appear by whom he was put in possession, or who authorized him to prevent her entering. The answer of Ephraim Lyles would lead to the conclusion, that he did' it; but -he claimed no interest in it. The defendants are understood to have ^acquiesced in the claim of Thomas Lyles, and he is the only person amongst the defendants who has had the use and enjoyment of any part, and it is not probable that Ephraim Lyles would take upon himself to incur the responsibility of turning out the complainant and putting in Thomas Lyles, who was as competent to act, and probably understood bis rights as well.
If Ephraim Lyles ousted the complainant of the possession, he is liable for the annual rents to the extent of the complainant’s interest, whether the plantation was cultivated in whole or in part, or not at all, for to the extent of her interest, she might have used it herself, or leased it to another; and if Thomas Lyles himself prevented the entry of the complainant, or. participated in the act of Ephraim Lyles, in ousting her of the possession, he is liable to the same extent: but if on the contrary, Thomas Lyles neither expelled, nor kept the complainant out, by any act amounting to force, he is liable only to the extent to which he cultivated the plantation, and not even in that case, to the complainant, unless he cultivated it to an extent greater than the interest of himself and the other defendants. As a co-tenant, he had the right to enter and use it to the extent of his own interest, and with the consent of the other defendants, to the extent of their interest also. This did the complainant no wrong if *64 the one third part to which she was entitled was left unoccupied, and the possession was not withheld from her. This has been repeatedly ruled by this Court. The case of Volentine v. Johnson, ante, 49, during this Term, is an instance.
The questions of fact are involved in so much uncertainty that I am unable to form any satisfactory judgment in relation to them. The evidence on this part of the case appears to have been taken as long ago as 1822, and it is apparent that about fourteen pages are wanting, and it is not improbable that the doubt in which it is involved arises out of that cause. These questions must therefore go back to be examined and reported on by the Commissioner, in connection with the amount of rent. (2 Eq. Rep. 499; 4 Eq. Rep. 270.)
In the old cases, some of which will befound in Equity *Reports, by Chancellor De Saussuee, negro hire was rated at £10 for full task hands, and £5 for half hands. In the prosperous times which succeeded the late war, and when produce sold for great price, the Courts departed from this rule, and much higher prices were allowed in some cases, but in the case of Moorman v. Foote and others, and Myers v Myers, decided since the present organization of the Court, the rule was resumed upon much consideration ; and my own experience and observation is, that it is as much as in general they are worth ; and I propose to subjoin tq this decree, an estimate upon which it is founded, (a) It never was intended to apply, in those cases where the party accountable, came to the possession and use of the slaves by force or fraud, but when he stood in an amicable relation, as trustee, guardian, or executor or administrator, bailee, &c., and is a substitute for the regular annual account which he ought to make. The decree of the Circuit Court has allowed the complainant for a part of the time $80, and for the remainder $10, for full task male hands ; and $60 for a part of the time, and $50 for the remainder, for full task females; and in that proportion for inferior hands, the young and the old. In the grounds of appeal, the complainant'insists that according to the evidence, even a greater sum than this should have been allowed; and it is very certain that the ordinary estimate of the value of negroes’s hire, sustained by innumerable instances, and actually letting to hire, greatly exceeds the £10 rule, and Occasionally, the amount claimed by the complainant, ($85 for males, and $65 for females) *65 but the result of the estimate which I propose to make, will show that the hirer must lose largely at those prices. Possibly one who has a plantation, stock and implements of husbandry, and which must remain unemployed for the want of hands, unless obtained by these means, may find his account in paying’ these prices, but pursued as a system it must prove ruinous. The counsel for the complainant has however submitted, whether this is a ease for the application of the rule, and if the Court should be against him on that question,* he asks that the value of the personal estate and interest upon it, should be substituted in the place of the account for slave hire.
The complainant charges in her bill, that she was forced out of the administration by the defendants. But this is not conceded in the answers, nor is there any proof pointed out which warrants such a conclusion. The witness Houston G-oree, says that he saw “ Ephraim Lyles and Mrs. Lyles jerk out of the hands of the complainant with violence, some article of clothing made up or not,” but I cannot perceive how any unfairness in respect to the administration of the estate can be inferred from this one circumstance. The impression which it has made upon my mind, is that it was a controversy between two old women about some article of clothing, probably a relict, in which Ephraim Lyles suffered himself to participate, and no more. It is no disparagement to the complainant to suppose that Ephraim Lyles, as a man, was more competent than herself to administer the estate; and nothing unfavorable to him can be inferred from the circumstances that he took upon himself the burthen of the administration. It is precisely what might have been expected, and what occurs in almost every administration where a man and a woman are *66 joined in the administration. Divested of the inferences which are attempted to be drawn from these circumstances, the case is precisely that contemplated by the rule, so far as Ephraim Lyles is concerned. It is the case of an administrator in possession and liable to account. But the case is still stronger. The evidence abundantly shows, that there was an understanding between Col. Lyles and the complainant, at the time of their intermarriage, that their estates were to remain and be kept separate, and that the children of each were to inherit their respective estates at their death. The complainant was provident enough to secure her own estate, and the paper executed by Col. Lyles was evidently intended to secure his also. Philip James the complainant’s first husband, was confessedly alive down to 1809 or ’10, after her marriage with both. Ken-nerly and Fennel, and his *death even then, is only proved by information received by his mother, who resided in North Carolina, and who was probably wholly unknown to the defendants, and they were probably also ignorant of any clue which -would lead to certainty. The result has shown, that Ephraim Lyles acted indiscreetly in making distribution of the estate, before the rights of the parties under the deed executed by Col. Lyles, and the fact of the death of Philip James, were judicially ascertained ; and considering the doubt and uncertainty in which these matters were involved, it would have been equally unwise in him to have assumed the responsibility of letting the complainant into the partition. Provident counsels would have suggested the propriety of postponing the partition, until these matters were finally adjusted, and if that had been done, the situation of Ephraim Lyles would have been precisely that contemplated by the rule It does the complainant no wrong, that she should be put precisely in the situation that she would have been, if the administration had been conducted in the most proper and regular manner, and for these reasons I am satisfied, that the case is one to which the rule is strictly applicable.
An actual partition of the property of which Col. Lyles died possessed, with an account of the rents issues and profits which it would have produced if prudently managed, is the strict measure of the complainant’s rights. But the defendants have made the personal estate their own by the partition and use, and they have no right to complain, if they are made to account -for the value at the time they received it, with the interest thereon, as a substitute for the hire of the negroes. The complainant has thought proper to accept the value and interest, as a substitute for the property, and the issues and profits, and it does not appear to me, that the Court can refuse to allow it. In this case there is an additional reason — two of the defendants, it is represented, to have removed to Mississppi, or some other of the western States with-their negroes, so that the Court has no means of making actual partition of these. Some ^le ne8Toes are said to have since died, and others may *have been disposed of by the parties, -and with respect to these, an account would be indispensable. It is therefore not only equally equitable and just, but infinitely more convenient. The inventory and appraisement of the personal estate, as far as that extends, must be taken as evidence of value, as more likely to furnish the true value than any that could be obtained at so distant a day. If there was property not included in these, other evidence must of necessity, be furnished.
*67 Primarily, Ephraim Lyles, the administrator, is unquestionably liable to the whole amount of the complainant’s rights ; but it is claimed for the complainant, that the other defendants should be decreed to be jointly liable with him, for the whole, on the ground that there was a conspiracy amongst them, to defraud the complainant. I am unable to perceive in the circumstances of this case, any feature that does not ordinarily occur in the mal-administration of an estate. As administrator in possession, Ephraim Lyles had at that time (before the act of 1824), the absolute power of disposition ; and there is no principle in law or equity which would make-.any one else liable for the manner in which he might dispose of it, nor can I perceive how there could be fraud in the exercise of a legitimate right. This claim is founded on the supposed insolvency of Ephraim Lyles. If that be true, the defendants are clearly individually liable, for what they may have severally received over and above their distributive share of the personal estate. They have received that which exeqao et bono, belongs to the complainant, and upon clear principles of equity, must account with her for it.
The sixth and seventh grounds of the complainant’s motion, complain that the decree of the Circuit Court charges the defendant Ephraim Lyles, with a less quantity of cotton than came to his hands, and that it charges the complainant with the value of a small amount of personal property which she retained, claiming it as a part of her own estate, and as having been included in her settlement on her daughter.
Both of these questions are mere matters of evidence, *and the Commissioner and Chancellor have both arrived at the same con-elusion. The evidence is, at best, doubtful, and this Court does not feel warranted in reversing their decision.
The right to order partition of the land, was evidently a mere omission, and will be provided for in the decretal order. In the progress of the cause, it seems that a survey was made of the lands, and it is alleged on the part of Thomas Lyles, that a-part of the land included in this survey did not belong to Col. Lyles at the time of his death, or at any time during his coverture with the complainant, but to himself. The Court have no means of judging of the truth of this allegation, but if there be any thing in it, the question will necessarily and properly arise on the return of the writ of partition.
The decree of the Circuit Court directs that the costs should be paid out of the estate; and the complainant appeals from that part of the decree, on the ground, that the defendants ought to have been charged with the whole amount of costs.
In Chancery, costs are regarded as discretionary; not as the subject of capricious discretion, but as the result of a reasonable and equitable deduction, from all the circumstances of the ease, and are so much under the control of the Circuit Court, that they are not of themselves regarded as the subject of appeal; and it is only in those cases where this Court reverses or substantially reforms the decree of the Circuit Court, that it assumes the authority to reverse an order made on the subject of costs. Here, the principles upon which the Circuit Court decree proceeds, are sustained throughout, and it is only in their application, that this decree varies from it; and on that ground, I question very much the propriety of varying the order with respect to costs. Judging of the case a priori, *68 this question is not free from difficulty. The circumstances before stated, would seem to have rendered it perilous for the administrator to have taken upon himself the responsibility of lefting the complainant into a partition,* and without any fault on his part, a suit was almost inevitable. This state of things arises out of the misfortunes of the complainant, Philip James’s abandonment of her: and notwithstanding I am strongly inclined to believe that the defendants have conducted this litigation with rather more zeal and acrimony than became the relation in which they stood to her, I cannot see my way so clearly, as to be certain that the Chancellor was in error; the order with respect to. costs, must therefore stand.
It was urged in the argument, but I do not observe it stated in the grounds of appeal, that the sureties to the administration bond, who are represented to be some of the other defendants, should be made liable for any defalcation of Ephraim Lyles in the event of his insolvency, but they are not charged in that character in the bill, and upon looking through the whole proceedings, it is nowhere stated who they were. This would, itself, be a sufficient reason for not making any order with respect to them. The complainant is moreover a party to the bond, and I can well conceive that questions might there arise, deserving more consideration and attention than has been bestowed on them in the argument. No order will be made, therefore, on that subject.
It is ordered and decreed, that a writ of partition do issue, to make partition of the lands, tenements, and hereditaments whereof the said Col. Aromanus Lyles was seized and possessed at the time of his death, between the complainant, his widow, and the defendants, his children, agreeably to the Act of Assembly in such case made and provided, and that it be referred to the Commissioner to ascertain the rents and profits of the said lands, and the person or persons liable to account for the same, according to the principles of this decree.
It is further ordered and decreed, that the Commissioner do state an account between the complainant and defendant, Ephraim Lyles, debiting him with the value of the personal estate which came to his hands, to be estimated at the value stated in the inventory and appraisement of the estate, filed in the Ordinary’s office and exhibited with his answer, and deducting therefrom what has been *ascertained to have been paid, laid out and expended in the due course of administration. That he set down to the credit of the complainant, one-third part of the nett balance, and deduct therefrom the amount of assets in the hands of the complainant; and that the said defendant Ephraim Lyles, do pay to the complainant the balance of the said qne-third part, with interest thereon from the first day of July, 1818.
It is also further ordered and decreed, that the said Commissioner do state an account with each of the other defendants, debiting them severally with one-seventh part of the value of the slaves of the intestate, stated in the inventory and appraisement aforesaid, and in default of payment of the sum due to the complainant, by the defendant Ephraim Lyles, after notice of the final order of the Court, that the said other defendants, John Lyles, James Lyles, Thomas Lyles, Aromanus Lyles, Yalentine Lyles, and William Moody and wife, do pay to the complainant six-sevenths of the sum so as aforesaid ascertained to be due and owing *69 to her severally, in proportion to the amounts they have respectively recovered.
It is further ordered and decreed, that the costs be paid, one-third part thereof by the complainants, and the remaining two-thirds by the defendants.
It is also further ordered and decreed, that the decree of the Circuit Court be reformed according to the principles of this decree, and that it be affirmed so far as it is consistent with this decree.
O’Neall, J., concurred.

 [The following is the estimate referred to.]
when the case of Moorman v. Eoote and others, was under consideration, I took some pains to correct my own limited experience and observation, by inquiries amongst the most intelligent and successful planters of the middle and up-country, as to the value of negro hire; and from the data thus collected, I have made the subjoined estimate. The first object of the planter, is to raise a sufficient supply of provisions and forage for family consumption, and no more. In the middle and upcountry, the usual habit is to clothe the negroes by the labor of the females, at times when they can be conveniently dispensed with in the field; and upon lands of medium quality, two bags and an half of cotton of three hundred pounds per task hand, is regarded as a good crop, taking a series of years together, and my own experience is, that this is a high average. I have not been able to obtain a precise estimate of the average price of cotton for the last ten or twelve years, and have adopted 12£ cents, as approximating it, andas answering the purpose of illustration. Overseer’s wages is a usual item of expense, and if one is not employed, the planter himself earns it and is entitled to it. This I have estimated at $10 per hand — cal *65 culating the wages of an overseer of 30 hands at $300. The account then stands thus:

Overseer’s wages per hand,.$10 00
Land rent, say 12 acres, per hand, at $1 50, . . . 18 00
Horse hire, per hand, ........ 5 00
IVear and tear of working tools and other implements of husbandry, machinery, &c.,.5 00
1 blanket, $2; 1 pair shoes,$1 25,. 3 25
Taxes, $1; physician’s bill, $2,.3 00
Bagging, rope and twine, $1 per bale, . . . • . . 2 50
Freight, per bale, $1.2 50
Commissions on selling cotton, 2J cents pr. ewt., . . . , 2 29
-$51 54
$12 21
Negro hire, £10=$42 86 . $42 86
Against the planter, .. 65
Salt and other little articles of expense, which force themselves upon the humane master, for which no certain estimate can be made, are intentionally omitted, and in every instance I have intended to put the other expenses, founded on calculation, something below their real estimate. If there is any thing omitted, subsequent experience will bring it to light; the intention of these remarks being to call the attention of the gentlemen of the law to the subject, with a view to establish a settled rule, if that already established should prove to be incorrect.